36 N. Y. 459–DISTINGUISHED, 60 N. Y. 160.

## THE PEOPLE OF THE STATE OF NEW YORK, Appellants, *v.* ALDEN VILAS *et al.*, Respondents.

The sureties upon the bond of a public officer, are not discharged by the imposition upon their principal of new duties of a similar nature and character, by an act of the legislature.

The position of a public officer is that of an agent or servant of the government, rather than that of a contractor of the government.

Where J. was, in 1850, appointed a commissioner for the county of St. Lawrence, to loan the moneys of the United States deposited with the State under the act of 1837, and the defendants became sureties for the faithful performance of his duties as such commissioner, and during the continuance of his office, the legislature transferred to such commissioner for the same purpose, moneys formerly held by another commissioner under the acts of 1792 and 1808, and J. became a defaulter, to the amount of $500 in the funds last transferred to him, and to a larger amount of the original fund; *held*, that his sureties were liable for the whole amount of his default.

THIS action was brought against the defendants who were sureties upon the official bond of M. P. Jackson, as loan commissioner of the county of St. Lawrence, for loaning the moneys of the United States deposited with the State. The bond was dated January 15, 1850. The questions of law that arose upon the trial at circuit were, whether a judgment of nonsuit, rendered in an action previously brought for the same cause, barred this action; and, second, whether the additional duties imposed upon the commissioners by the act of April 10, 1850, discharged their sureties. It appeared in the present case that by the operation of that act, five hundred dollars was added to the capital of the fund in charge of the commissioners of St. Lawrence county, which, prior thereto, was upward of eighty thousand dollars. The cause was tried by the court without a jury, and upon the above grounds judgment was rendered for the defendants which, upon appeal to the General Term of the fourth district, was affirmed upon the latter ground, from which the plaintiff appealed to this court.

*J. H. Martindale*, Attorney-General, for the appellant.

*J. C. Brown*, for the respondent.

36 N. Y. 459–FOLLOWED, 25 Hun 284.

36 N. Y. 459–APPLIED, 92 N. Y. 395.

Grover, J. Judgment of nonsuit in the previous action was no bar. (*Brintnall* v. *Foster*, 7 Wend., 103. *Audubon* v. *Exchange Insurance Co.*, 27 N. Y., 216.) Such was always the rule in actions at law. In equity suits the rule is different. A decree dismissing the complaint, unless made without prejudice, bars a second suit for the same cause. The real question in this case is, whether the addition made to the capital of the fund placed in charge of the commissioners by the act of April 10, 1850, discharged the sureties upon their official bonds. An examination of that act will show that it contains no provision effecting such a result, unless it is produced by this addition thereby made to the capital of the fund. This presents a question of vast importance to the public. It not only affects all the official bonds of all this class of commissioners holding office at the time of the passage of the act, but, on examination into the matter, would, I think, show that it affected a great number of official bonds in other cases. This consideration cannot change the law if settled in favor of the sureties, but the obvious inconvenience of a rule working such results requires a thorough examination of the reasons, and authority upon which it is claimed to be established. As between private parties, the law is that any alteration in the obligation or contract, in respect of which a person has become surety without the consent of the latter, extinguishes his obligation and discharges him (Burge on Surety, 214; Theobold, § 132; *Whirton* v. *Hall*, 5 Barn. & Cress. 269); and this result follows, irrespective of the inquiry whether the alteration could work any injury to the surety or not. (*Bangs* v. *Strong*, 4 Com., 315.) The reason upon which this rule is founded is, that the surety has never made the contract upon which it is sought to charge him. His answer is, if it is sought to charge him upon the altered contract, that he never made any such bargain; and if upon the original contract, that such contract no longer exists, having been legally terminated by the altered or substituted contract made by the parties. In either contingency, the answer furnishes a complete defense. It is claimed by the defendants, that the same rule is applicable to official

bonds. In this they are right, if the reasons apply and the same answers can be given. An official bond is a contract with the people for the faithful discharge of the official duties of the officer. In the present case it was, that Jackson should faithfully discharge the duties of said commissioner, pursuant to the act entitled an act authorizing a loan of certain moneys belonging to the United States, deposited with the State of New York for safe keeping, and should discharge his said duties without favor, malice or partiality. These duties Jackson has not performed, but the sureties claim to be discharged, on the ground that, subsequent to the making of the bond, five hundred dollars was added to the capital of the fund. The duties of the commissioner as to this five hundred dollars were precisely the same as required for the capital of the fund, and precisely those required by the act referred to in the bond. The position of the defendants must go to the extent that any alteration made by the legislature in the act affecting the duties of the commissioner will discharge his sureties. In other words, that the bond is to be regarded as a contract faithfully to discharge the duties of the office as then prescribed by the act, and that any alteration in these duties made by the legislature subsequently, alters the contract, and hence discharges the sureties. If this position be sound, it follows that no change can be made by the legislature relative to the amount of money in their hands, the mode of loaning it, their compensation or their duties in any respect, without discharging their official bonds.

It may be remarked that it would not only relieve the sureties upon the bond but the officer himself, unless it should be held that his continuance in office after the passage of the act making the change was an assent on his part to such change. The analogy between this class of cases and the contracts of individuals fails in this respect. In the latter no alteration can be made without the mutual assent of both parties. In the former the legislature have power at any and all times to change the duties of officers, and the continued existence of this power is known to the officer and his

sureties, and the officer accepts the office and the sureties execute the bond with this knowledge. It is, I think, the same in effect as though this power was recited in the bond. Had this been done it would not be claimed that the sureties were discharged by its exercise. That an individual given a guaranty of the faithful performance of a contract by one party containing a clause authorizing the other to make alterations in certain of its provisions, it would not be claimed that the surety was discharged by alterations so authorized; and yet this is nothing more than the sureties knew the legislature were competent to do in the present case. Why has it never been claimed in behalf of officers who had given bonds for the discharge of their official duties, that a contract had been made with them in relation thereto unchangeable by the legislature? Simply because it is understood that all these acts are subordinate to the law-making power, and necessarily subject to such changes as may from time to time be deemed expedient. Every official oath is so interpreted. It is not true that one taking an oath to discharge the duties of any office simply swears to discharge them as then prescribed by law; but that he swears to discharge them as they may from time to time be fixed and regulated by the law-making power. So an official bond conditioned for the discharge of the duties of the office should in like manner be understood, not as restricted to duties as then prescribed by law, but as embracing the duties of the office as from time to time fixed and regulated by the legislature. It may be said that, although such might be the general rule, yet that the bond in the present case contains a reference to the act, and requires the duties to be performed in accordance therewith. To this it may be answered, that section three of the act providing for giving the bond and its requisites requires no such reference, and that the bond in suit, in addition thereto, contains all required, that is, the true and faithful performance of its duties without favor, malice or partiality. The act does not prescribe the amount of money to be placed in, or which shall remain in the hands of the commissioners. In the absence of authority determining

the question otherwise, my conviction is, that any alteration, addition or diminution of the duties of a public officer made by the legislature, does not discharge his official bond or the sureties thereon so long as the duties required are the appropriate functions of the particular officer.  That all such alterations are within the contemplation of the parties executing the bond.   That imposing duties of another description, and not appropriate to the office, would discharge sureties not coming within such contemplation.

The question was regarded by the Supreme Court as settled in favor of the sureties by a series of decisions.  If this be so, it is equally binding upon this, as upon any other court.   No case holding any such doctrine has been decided by the courts of this State; neither the opinion of the learned justice, nor the brief of counsel contain any reference to any case in this State where the point has been involved, nor have I been able to find any such case.   *Bonar* v. *McDonald* (1 Eng. Law and Equity) was a case between private parties, a bank and its agent, where the duties and responsibilities of the latter were increased by the bank, and has therefore no application to the present case.   The same may be said of the *Northwestern Railway Company* v. *Whitney*, a contract between the company and its agent.   In *Oswald* v. *Mayor*, etc. (26 Eng. Law and Equity), the question was, whether the bond embraced a new appointment to the office.   *Bartlett* v. *Attorney-General* was the case of a new deputation, new security given for the additional duty.   *Pybus* v. *Gibbs* (38 Eng. Law and Equity), is the only case where the question presented for judgment in the present case, was directly involved.   In that it was held that the sureties of a bailiff of a county court were discharged, on the ground that his powers had been enlarged and his responsibilities increased. The court do not appear to have considered the point, whether there was not a well grounded distinction between official bonds and contracts of private parties.   There have been several cases in this country where it has been held, that a subsequent change of the duties of an officer do not discharge his sureties.   In *White* v. *Fox*, 9 Shepley (Maine),

it was held that a change in the duties of a clerk of the court did not discharge his sureties, the court saying that the sureties were bound for the faithful discharge of the duties of the office, that is, for the faithful discharge of such duties as the laws for the time being should require to be performed by the clerks of judicial courts; and further, that there was but little similarity between such cases, and those arising out of offices or trusts regulated by contract. (*The People* v. *McHatton*, 2 Gilm., 216.) It was held, that a legislative extension of the time for paying over the taxes of three weeks did not discharge the sureties of the officer. *State* v. *Carleton* (3 Gill., Md.) is a similar case. In *Kindle* v. *State* (7 Black., 586), a similar rule was applied where the time for payment by a county treasurer was extended. In *Coulter* v. *Morgan's Administrator* (12 B. Monroe, 278), it was held, that the sureties were bound, although the taxes were increased after the giving of the bond. In *Mooney* v. *State* (13 Mo., 7), it was held, that sureties of a sheriff were bound for the performance of new duties created after giving the bond. *Bartlett* v. *Governor* (2 Bibb, Ky.), a similar ruling was made. Other similar cases might be cited, but those already cited I think sufficient to show that a legislative alteration of the duties of an officer do not discharge his sureties so long as the duties remain appropriate to the office. My conclusion is that the judgment should be reversed, and a new trial ordered, with costs to abide event.

HUNT, J. This was an action brought against the defendants as sureties upon the bond of one Mahlon Jackson, who was appointed a commissioner for loaning certain moneys of the United States, under chapter 150 of the Laws of 1837. By an act of the legislature, passed in April, 1850, and subsequently to the appointment of Jackson, certain additional duties were imposed upon the commissioners thus appointed, which consisted chiefly in receiving, investing and accounting for certain moneys, formerly under the control of other commissioners. Jackson was a defaulter to the amount of $2,134.59, of which $500 was of the moneys received by

virtue of the last mentioned act, and the residue was of moneys received by him under his original appointment. The judge at the circuit held that the act of 1850, and the transfer under it, discharged the sureties of Jackson, and that no recovery could be had against them. The plaintiffs were nonsuited, and the judgment of nonsuit was affirmed at the General Term. The plaintiffs now appeal to this court.

On the 15th day of January, in the year 1850, Mahlon Jackson was appointed one of the commissioners for the county of St. Lawrence, for loaning certain moneys belonging to the United States, deposited with the State of New York for safe keeping. The appointment was made in pursuance of the provisions of chapter 150 of the Laws of 1837. (Laws, 1837, p. 121.) The defendants became sureties for said Jackson in the bond executed by him, under the said act. The act required the bond to be in a penalty named, and was to be conditioned "that if the above bounden (Jackson) shall well and faithfully perform the duties of said commissioner, pursuant to the act entitled 'An act authorizing a loan of certain moneys belonging to the United States, deposited with the State of New York for safe keeping,' and shall discharge his said duties without favor, malice or partiality, then this obligation to be void, otherwise to remain in full force and virtue" (p. 126, § 20). The bond was executed in conformity with the statute. The statute provides for the distribution of certain moneys received by the State from the federal government, among the different counties of the State, according to their population, for the purpose of being loaned to the people of the said counties, in the manner therein specified. The duties of the commissioner, whose appointment was therein provided for, consisted generally in receiving the said moneys from the State, in loaning them upon bond and mortgage, collecting the interest thereon yearly, and the principal from time to time as it might become payable, re-investing the principal, and paying the interest to the State. The act contained much detail, but the substance of the duties of the commissioner is as I have stated. The commissioner, Jackson, and his colleague,

received under this act, the sum of about $80,000 in bonds and mortgages and cash. The State had also, in 1792 and in 1808, made certain loans to the people of the different counties, of its own moneys, and had appointed commissioners to attend to the same, whose duties were of the same general character as those appointed under the act of 1837, referred to. In April, 1850, the State determined to close up the business of the commissioners under the laws of 1792 and 1808, and provided that it should thereafter be transacted by the commissioners appointed under the act of 1837. (Laws, 1850, ch. 337, p. 732.) The fifth section of this act provided that the mortgages thus transferred should " form a part of the capital of the United States deposit fund, and the said commissioners for loaning certain moneys of the United States, shall exercise the same powers in relation to such mortgages, in the collection of principal and interest thereon, and in proceedings in case of default, and shall receive the same compensation therefor, as if said mortgages had been originally executed " under the act of 1837. Under this authority, securities or moneys to the amount of $500 were received by Jackson and his colleague. Upon the termination of his office, in 1853, Jackson was in default in his accounts to the State in the sum of $2,134.59. This action was brought to recover the same from the defendants, who were his sureties. It was proved, that of the default, $500 consisted of moneys received by virtue of the act of April, 1850, and the residue was of moneys received under the original authority. The judge trying the cause, and the General Term of the fourth district, held that the passage of the act of 1850, and the transfer under it, vitiated and annulled the bond of the sureties of Jackson, and that no recovery of any part of the amount could be had against them. The correctness of this decision is the question now before us.

The defendants are sureties simply, and must respond according to their bond, nor more, nor less. It cannot be enlarged or extended, nor are we called upon to diminish it. The position to which Jackson was appointed, was that of a

public office. He was appointed by the governor, with the concurrence of the senate. He was required to take the usual oath of office, and, in various sections of the act, the position is in terms designated as an office. The chief duty of his office was to receive and invest certain moneys intrusted to his care by the State. When an additional sum of money was placed in his charge by virtue of the act of 1850, it was in all respects subject to the same regulations and to be disposed of in the same way as the other moneys in his custody. No alteration was made in the nature, character or duties of his office. An additional amount of duty, in every particular, of the same nature as that already existing, was imposed upon the office. (§ 5, *supra*). It was expressly enacted that the new securities should form a part of the capital of the United States deposit fund, and it was a portion of the original subject, so far as legislative power could make it such. In the language of the court in *The Rochester City Bank* v. *Elwood* (21 N. Y., 92), this " was within the range of the *class* of duties, that might properly be assigned " to such an officer. It was not like the case of *Bonar* v. *McDonald* (1 Eng. Law and Equity, 1), where a clerk in a banking house had been employed at a specific salary, upon the agreement that he should embark in no kind of business or adventure, and the defendants having become sureties for the faithful discharge of his duties, the plaintiff increased his salary, upon his agreement to bear one-fourth of the losses to be incurred in the discounts obtained by him. The new agreement, it was held, created an entire change in the character of the business to be done by the principal, and was in direct violation of a part of the original understanding. It changed entirely the character of the responsibility of his sureties, and the court held them to be discharged altogether.

So in *The N. W. Railway Company* v. *Whinray* (10 Exch., 77), the defendant became surety in a bond, which recited that A. B. had been appointed clerk to a coal company, at a yearly salary of £100, and conditioned for the faithful accounting for all moneys received by him for the use of the company. After a time the company substituted for the

salary a commission of 6d per ton for all the coal on which he should obtain orders. On a suit against the sureties, it was held that the condition was restrained by the recital, and that the liability only continued while the clerk remained at the fixed salary. *Pybus* v. *Gibbs* (6 Ellis & Black, 903 ; 88 Eng. C. L., 903), was a case where a bond was executed by G. and two sureties, conditioned for indemnifying the high bailiff of the county court, against liabilities from the misconduct in his office of G., who was appointed one of the bailiffs. At the time the bond was executed, the duties of the office were regulated by 9 and 10 Victoria, chapter 95, and after the execution of the bond the jurisdiction of the county court was extended and increased by five additional statutes. It was held that these statutes so materially altered the nature of the office, that the sureties were no longer liable to indemnify the high bailiff, even though the misconduct of G. was in a matter in respect to which the duty of the bailiff had not been altered by the subsequent acts. Among other alterations were those giving bankruptcy jurisdiction, authorizing the arrest of absconding debtors, and an increase of jurisdiction from cases under £20, to cases involving £50, and by consent, to any amount, and an entire change in the fees, the bailiff was authorized to demand. In deciding the case, Lord CAMPBELL, Ch. J., says : " It may be considered settled law, that where there is a bond of suretyship for an officer, and, by the act of the parties or act of parliament, the nature of the office is so changed that the duties are materially altered, so as to affect the peril of the sureties, the bond is avoided. * * * There being then an increase in the jurisdiction of the court as to amount, a change in the nature of the court by giving bankruptcy jurisdiction, and jurisdiction over absconding debtors, and the table of fees being altered, I think that the office is essentially changed, and the sureties no longer liable." COLERIDGE, J., says : " When the nature of the employment of the principal is so altered by the act either of his employee or of the legislature, that the risk of the surety is materially altered, the surety has the right to say, I did not bargain for this, I

am discharged." After reciting the facts, WYGHTMAN, J., says: "It appears to me, therefore, that, in this case, the effect of the increased jurisdiction, was so to alter the court and the office of bailiff, as to affect the liability of the surety to his prejudice."

A case is cited, in the opinion of the Supreme Court, from Parker's reports (*Bartlett* v. *Attorney-General*, Park. 277), to the effect that a person who had become surety for a collector of the customs received upon his appointment in 1691, was held not liable in respect of customs which were first imposed in 1698. This doctrine would annul the bond of every canal collector in the State, or of every collector of customs or of internal revenue in the United States, whenever the government made any change in their rates or duties. But I do not think the law to be such. A public officer takes his office with the obligation to perform all the duties incident to or connected with it, then existing, or that may be added by the legislature, provided the nature and character of the duties remain the same. The imposition of duties of the same nature and character or the withdrawal of portions of them, pertain to the position. It is indispensable to the proper management of public affairs, and serious injury to the public interest would occur were the rule otherwise. The obligation is for a faithful performance by the principal of all the duties of the office, during the term of his appointment, not of the duties as they exist at any particular moment. His duties vary with the requisitions of the statute; and whatever the statute imposes or withdraws, becomes or ceases to be a part of his duty. The only limitation to this rule is that the duties imposed shall be of the same general nature and character. Many cases are cited from the western reports, establishing this precise principle, for which see *post*, and see also *White* v. *Fox*, 9 Shepley (Maine), 341.

The additional duty imposed upon Jackson by the act of 1850, was plainly of the same nature and character as the duties belonging to the office when the sureties executed their bond. It was simply to receive, invest and pay the interest

on an additional amount, at the same time, in the same manner, and subject to the same regulations as were prescribed in respect to the moneys already in their hands.

The case of *United States* v. *Kirkpatrick*, (9 Wheaton, 720), is in apparent conflict with these views. It is not cited by the respondent's counsel, or by the court below, and it may be sustained upon its facts, without violating the rule as I have stated it, upon the ground that the sureties were only liable for breach during the first appointment. So far as it conflicts with the principles laid down, I do not find that it has ever been recognized or affirmed. I cannot consider it sound or practicable in the administration of the affairs of government.

The view that I have taken of this case, is in harmony with the recent English case of *Skillett* v. *Fletcher*, decided in May, 1867, in the Exchequer Chamber. The declaration was on a bond conditioned for the due performance by Skillett of his duties as a collector of poor rates, and also of sewers and general rates for the parish of S. Breach, that he had received money in each capacity, and had failed to pay it over. The plea alleged that, by the provisions of 21 and 22 Victoria, the duties of the collectors of sewers and general rates, were altered and increased, and a new office of collector of main drainage rates created, to which Skillett had been appointed by the same persons who had appointed him collector of the former rates. To this plea there was a demurrer, and judgment upon the demurrer was given in the Common Pleas for the plaintiff (1 Law Rep., 1 C. P., 217), and upon appeal to the Exchequer Chamber, the judgment was affirmed; the court holding that the sureties were not discharged by an increase of duties imposed upon the collector, such as that of a new drainage rate, or an increase of the rate, and that there was no change in the nature of the office. (2 Law Rep., 2 C. P. 469.)

If, however, this statute did alter the nature and duties of the office of commissioner in the manner alleged by the respondent, so that the peril of the sureties was increased, did it operate to release them entirely, or only as to liabilities

arising from such additional duties ? The case of the sure-
ties for the performance of his duties by a public officer, is
not precisely the same as if their principal was a party to
an ordinary civil contract. His position is rather that of an
agent or servant of the government than a contracting party.
In the present case certain duties were imposed upon com-
missioners by the laws in existence prior to 1850, when the
sureties assumed their responsibility. A subsequent law
imposing additional duties does not impair the prior laws or
the obligations under them. Herein the present case differs
from the most of the authorities cited, which were cases of
contract simply. The altered contract in those cases takes
the place of and entirely ends the original contract, and if
the party is not a surety upon the substituted contract, he is
so upon none, for none other is in existence. In the present
case the superadded duties have not affected the original
duty. It remains in force and the obligation for its perform-
ance is the same as if no new law had been passed. Why
should not the obligation of the sureties for the original duty
also continue ? The case of *Bonar* v. *McDonald* (1 Eng.
Law and Eq., 1) was the case of a civil contract for the per-
formance of the duties of a bank agency, and when the new
contract was made, that the principal should bear one-fourth
part of the losses, the original contract of employment was
canceled. Not being parties to the new arrangement, there
was therefore nothing to which the obligation of the sureties
could attach. *The Northwestern Railway* v. *Whinray* (10
Exch. R., 77) was a private contract of the same character.
*Oswald* v. *Mayor of Berwick-on-Tweed* (3 Ell. & Bl., 652; 77
Eng. C. L., 653, and cited in various other places) is not an
authority upon this point. The liability was there held to
exist on the ground that the change in the tenure of the
office was provided for in the bond itself, and that the sure-
ties could therefore take no exception to it. *Pybus* v. *Gibbs*
(6 Ell. & Bl., 902; 88 Eng. C. L.) is more in point. It was,
however, decided upon *Bonar* v. *McDonald* and *Oswald* v.
*Mayor of Berwick* (*supra*), also upon the ground that the
*duties of the office* had been essentially altered, and the distinc-

tion between a civil contract which is ended and an obligation imposed by law, which still continues, is not adverted to. So in *Miller* v. *Stewart* (9 Wheat., 680), there was but one instrument of appointment; and when altered in an essential part, it ceased to be the obligation of the sureties, and all liability on their part ceased. The position I have stated is sustained by the following cases: In *Coulter* v. *Morgan* (12 B. Monroe, 278), and in *Mooney* v. *The State* (13 Missouri, 7), and in *Bartlett* v. *Governor* (2 Bibb, Ky.), and in *Walker* v. *Chapman* (22 Ala., 46), and in *Graham* v. *Washington County* (9 Dana, 184); *Governor* v. *Ridgeway* (2 Ill., 14); *Camphor* v. *People* (12 Ill., 290). Sureties were held to be liable in cases like the one now under discussion.

New trial should be had.

All concur.

Reversed.